IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 15, 2015 at Knoxville

## STATE OF TENNESSEE v. LLOYD ARLAN JONES

**Appeal from the Circuit Court for Williamson County**
**No. I-CR116852    Joseph A. Woodruff, Judge**

---

**No. M2015-00657-CCA-R3-CD – Filed January 14, 2016**

---

The Defendant, Lloyd Arlan Jones, appeals as of right from his jury conviction for domestic assault. The Defendant contends that the trial court erred by admitting several hearsay statements into evidence and by declining to charge domestic assault by extremely offensive or provocative physical contact as a lesser-included offense of domestic assault by causing bodily injury. Furthermore, he submits that the cumulative result of these errors entitles him to a new trial. Following our review, we discern no error and affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Vanessa P. Bryan, District Public Defender; Benjamin C. Signer, Assistant Public Defender (on appeal); and Robert W. Jones and M. James Pulido, Assistant Public Defenders (at trial), for the appellant, Lloyd Arlan Jones.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Kim R. Helper, District Attorney General; and Tammy J. Rettig, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

On November 5, 2012, a Williamson County grand jury indicted the Defendant for domestic assault by causing bodily injury to G.K., a thirteen-year-old child ("the

victim"), with whom he lived.  See Tenn. Code Ann. §§ 39-13-101, -111.  The case proceeded to a trial by jury in January 2015.

At the Defendant's trial, Corporal Michael Deloach of the Williamson County Sheriff's Office testified that, on August 8, 2012, he responded to a residence on Pinewood Road regarding a domestic disturbance call.  Upon his arrival at the home, Cpl. Deloach observed the Defendant loading his truck, who was apparently in the process of moving out.  According to Cpl. Deloach, the Defendant was being assisted by two children, G.K. and C.K.[1]  The children's mother, T.K., who placed the 9-1-1 call from a neighbor's house, was not present initially.

Cpl. Deloach asked the Defendant "what was going on."  According to Cpl. Deloach, the Defendant "seemed a little irritated" by his presence at the residence, and the children "were just real quiet, . . . hardly look[ing] at [him] at that point."  The Defendant replied to Cpl. Deloach, "She's mad at me and she called the cops . . . on me again, and something about a phone."  At that time, T.K. emerged from the neighbor's house, and Cpl. Deloach approached T.K. and asked her "what was going on[.]"  T.K. informed him that the verbal altercation "was about a phone that [the Defendant] had taken[,]" and "[s]he was wanting the phone back, stating it was hers."  Cpl. Deloach said that he then spoke with the Defendant again, who told him that he had bought the cellular telephone for T.K. and paid for the plan, so Cpl. Deloach concluded that he could not make the Defendant return the phone to T.K.  Cpl. Deloach informed T.K. that "there [was] nothing else [he] [could] do at that point."  Cpl. Deloach testified that he was "about to clear the call," when T.K. told him that the children "needed to show [him] something, that they had an injury from an altercation they had the day before."

Cpl. Deloach interviewed the children either on the front porch or inside the home; he could not recall the exact location.  G.K. and C.K. informed Cpl. Deloach that the Defendant had spanked them the day before, August 7.  G.K. showed Cpl. Deloach an injury "that was right below his right buttocks[,]" which "was a real deep purple bruise[,]" and C.K. showed him a "red scratch" "on his right buttocks."  Cpl. Deloach further described G.K.'s bruise:  "It was probably about the size of—probably 3 inch diameter. . . .  It would be about softball size in area."  The Defendant admitted to Cpl. Deloach "that he did take a switch to the children[,]" and Cpl. Deloach thereafter placed the Defendant under arrest for domestic assault.

Cpl. Deloach took written statements from the children and T.K. that day and took pictures of G.K.'s injury.  Two photographs of G.K.'s bruise were admitted as an exhibit to Cpl. Deloach's testimony.

---

[1] Consistent with the policy of this court, minors are identified by their initials.  And to further protect the anonymity of the minor children, we will refer to their mother by her initials also.

Detective Melissa Colvin with the Williamson County Sheriff's Office testified that she worked primarily on domestic cases, including elder abuse and child abuse cases, and that she conducted a "follow-up" in this case. Det. Colvin interviewed T.K., the two children, and a neighbor, and she collected a "two foot long" tree branch, which was identified by T.K. The branch was not "logged . . . into evidence" until October 2012.

Both C.K. and T.K. testified about the whipping they received at the hands of the Defendant on August 7. C.K., fourteen years old at the time of trial, testified that in 2012, he lived on Pinewood Road with his mother, two brothers, sister, and the Defendant. C.K. was asked about the incident leading to the Defendant's arrest. According to C.K, he and G.K. were supposed to mow the yard that day but, after a lawn mower tire went flat and there was a "yellow jackets' nest in the yard[,]" they could not finish mowing the entire yard. When the Defendant returned home, "[h]e got mad" because the yard was not completely mowed and "there was a tool left in the yard[.]" The Defendant had the two boys "line[] up against the truck" behind the family's garage and "tore a branch off the tree and . . . whooped [them] with it."

C.K. described the tree branch as two to three feet long and roughly "three inches tall" or thick. According to C.K., the Defendant said that, if C.K. attempted to cover his bottom with his hands, C.K. would "get whipped harder." The two boys bent over the tailgate of the truck, and the Defendant "whooped [them] really hard" with the tree branch. G.K. was spanked first and started screaming, according to C.K. When the Defendant began hitting C.K. on the bottom, "a little piece" of the branch "broke off[.]"

C.K. claimed that the Defendant left the screwdriver in the yard. However, the Defendant thought he was lying and made C.K. do push-ups for leaving it in the yard. If C.K. did not do them as instructed, the Defendant said "he would whoop the holy hell out of [him]." He could not remember if his brother was also forced to do push-ups.

The following morning, his mother called 9-1-1 about the Defendant's taking her cellular telephone. According to C.K., after his mother made this call, G.K., in C.K.'s presence, told their mother about the spanking. C.K. recalled seeing a "purple and brown" bruise on his brother's body, "[a] little lower than his butt[,]" following the whipping. Furthermore, according to C.K., both he and his brother "point[ed] out" the branch used to spank them, which was left in the fire pit in the yard.

G.K., born in January 1999, was sixteen at the time of trial. G.K. provided the following version of events:

Well, at the time we were all, me, C.K., my mother, [and] my little brother . . . were living with [the Defendant]. At the time he had come home and the yard was not done, and he was angry during the day. And so

-3-

when he came home he was yelling, he was angry. He had us working with him on the yard. But then he found his tools out in the yard and asked us if it was us. We said, no, it wasn't and he didn't believe us. So, at that time, he had put us up against an old truck we had out in our back yard and he went and broke a branch off a tree, and had us lined up against the car and hit us with it.

. . . .

[The yard] was supposed to be cut. But the reason why it wasn't was a week before he came home, we were cutting the grass but came upon a nest of yellow jackets in the ground that came out and stung us. And so my mother . . . had called him and said he would take care of it. But when he came home, it wasn't done.

Once the Defendant found the tool in the yard, which G.K. said was a hammer, the Defendant "started cussing" and calling them names because he thought they were lying to him. G.K. said that they remained quiet for fear "it would only get worse." The Defendant then "took off the branch" from a tree and whipped them, according to G.K. G.K. depicted the branch as approximately two and one-half feet long with "a knot on the end, kind of where he had his hands around it." G.K. remembered that he was whipped first and that he responded by "crying" and "yelling." He could not recall exactly how many times he was hit. The Defendant then spanked C.K., who was also "screaming and crying." According to G.K., the Defendant threw the branch in the fire pit when he was finished whipping them, and their mother later retrieved it when C.K. and G.K. pointed it out to her. G.K. testified that he pointed the stick out to his mother "close to the original date" of the spanking. G.K. identified the stick collected by Det. Colvin as the one used by the Defendant that day, and it was entered into evidence.

As a result of the whipping, G.K. suffered "[a] large bruise on [his] back thigh[,]" which he described as a "giant, blue [and] purple bruise" that lasted for about a week. When asked if there was any pain associated with the bruise, G.K. said, "Yes, ma'am, every time I would sit down it hurt and every time [I] would pick up to run a little bit it would kind of ache in a way." He also said that the force of the hit was "[p]robably a little less than a baseball bat." G.K. affirmed that the photographs previously entered into evidence accurately depicted his injury. When asked if he let his mother know about the incident, G.K. said not directly but claimed he "mouthed to her when she burst into the house, . . . 'help us,' in a silent way."

On cross-examination, G.K. agreed that he helped the Defendant with projects around the house, including putting up a fence. He confirmed that, while digging holes for the fence, he fell into one of those holes. On redirect examination, G.K. testified

-4-

about his broken elbow that resulted from the fence hole fall and about another incident that resulted in a broken leg.

The Defendant was convicted as charged of domestic assault by intentionally, knowingly, or recklessly causing bodily injury to G.K. He received a sentence of eleven months and twenty-nine days to serve. This timely appeal followed.

## ANALYSIS

On appeal, the Defendant contends the following: (1) the trial court erred by admitting several hearsay statements into evidence; (2) the trial court erred by refusing to charge domestic assault by extremely offensive or provocative physical contact as a lesser-included offense of domestic assault by causing bodily injury; and (3) the cumulative result of these errors entitles him to a new trial. We will address each in turn.

### I. Hearsay Statements

The Defendant argues that the testimony offered (1) by the victim that he had been diagnosed with Osteogenesis Imperfecta or "brittle bone disease"; (2) by Cpl. Deloach concerning T.K.'s stated reasons for making the domestic abuse 9-1-1 call; and (3) by C.K. that the victim told his mother "about what happened"; are all inadmissible hearsay and do not fit within any of the hearsay exceptions. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802. Whether a statement constitutes hearsay and whether it falls under one of the exceptions to the hearsay rule "are questions of law subject to a de novo review." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015), reh'g denied (Feb. 6, 2015), cert. denied -- U.S. --, 136 S. Ct. 335 (2015).

A. The victim's testimony about his brittle bone disease diagnosis. The Defendant argues that the trial court erred by allowing the victim to testify about his diagnosis for brittle bone disease because such testimony was inadmissible hearsay. The State responds that the testimony was not offered for the truth of the matter asserted therein because, according to the victim, the diagnosis was unconfirmed. Alternatively, the State submits that, even if the statement is hearsay, its admission was harmless.

First, we feel it necessary to place the testimony and the trial court's ruling in proper context. On cross-examination of the victim, defense counsel asked G.K. the following:

Q. But [the Defendant] had been living with you off and on when he was in town?  He's a heavy equipment operator so he goes out of town a lot, is that right?

A. Yes, sir.

Q. When he comes in, you do things together don't you?

A. Yes, sir.

Q. And you had projects that you worked on?

A. Yes, sir.

Q. And one of the projects was putting up a fence.  You were digging fence holes?

A. Yes, sir.

Q. Did you fall in one of the fence holes?

A. Yes, sir.

On redirect examination, the prosecutor asked the victim to explain what happened when he fell in the fence hole.  The victim described the incident:

[W]e were out back grooving pieces of wood, two by fours and four by fours, I'm not sure.  We are digging holes, making a fence and the truck we were using had—the battery had died out.  So, we were going to use his current charge that he uses to travel and such to charge it back up.  And when we did so, he was inside of the older truck and when it started up, it scared me and I took a step back.  When I took a step back, I did not realize the hole was behind me and I fell and hit my elbow on the rim of the hole.

. . . .

It was just kind of a numbing feeling, it didn't really hurt.  So, I was like, oh, and I got out of the hole and I was feeling a bit dizzy, so I asked to go sit down inside.  I went down inside and sat down at the dining table with my hand over my elbow and fell asleep.  I woke up, probably about ten minutes later and he said to me, must not be hurting that bad because if it were, you would be crying.  And so the rest of the night, I just kind of did the regular and you know, relaxed a little bit.

According to the victim, his mother took him to the hospital the following morning because the elbow continued to hurt. Once there, it was determined that the elbow was "shattered." The prosecutor then asked, "Have you ever been diagnosed with anything such as brittle bone disease or any other type of ailment such as that?" The victim responded, "I was diagnosed with [b]rittle [b]one [d]isease, but it was never confirmed . . . because the only reason that they considered it was because the whites of my eyes were blue. But all my normal breakings have been from normal situations." Defense counsel objected on hearsay grounds, which objection was overruled without discussion, and the victim then testified about "some other breaks" he had before, including a broken leg.

At the motion for new trial hearing, the trial court ruled that the Defendant had "opened the door" to testimony about the brittle bone diagnosis because of the questions posed by defense counsel during the victim's cross-examination. The trial court further determined that, even if the statement was hearsay, it was admissible as an exception to the rule against hearsay as a statement made for the purposes of medical diagnosis or treatment. See Tenn. R. Evid. 803(4).[2]

Initially, we conclude that the trial court mischaracterized what occurred at trial by finding that defense counsel "brought up the fact that [the victim] had been diagnosed with [b]rittle [b]one [d]isease" on cross-examination of the victim. What defense counsel did inquire about on cross-examination was whether the victim and the Defendant worked together to build a fence and whether, during that project, the victim fell into a fence hole that had been dug. Although it was not established when this fall occurred, the only apparent purpose of this line of questioning by the defense was to offer an alternate source for the victim's injury, i.e., that the victim's bruise resulted from the fall into the fence hole and not from a blow by the Defendant. No question was posed and no testimony was given about a possible diagnosis of brittle bone disease on cross-examination.

The victim's testimony is his recollection of a doctor's unconfirmed medical opinion, and it amounts to an out-of-court statement made to him by the doctor.

_____

[2] Tennessee Rule of Evidence 803(4) excepts from the general prohibition against hearsay:

> Statements made for purposes of medical diagnosis or treatment and describing medical history; or past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

The theory behind this exception to the hearsay rule is that information given to medical personnel for the purpose of securing diagnosis or treatment may be deemed inherently trustworthy. See State v. Gordon, 952 S.W.2d 817, 822 (Tenn. 1997) (citations omitted). The text of the rule makes it clear that only the statements of the person being diagnosed or treated are excepted from the prohibition against hearsay. See State v. Rucker, 847 S.W.2d 512 (Tenn. Crim. App. 1992). The brittle bone disease diagnosis was a statement made by the doctor in assessing the victim's medical condition.

However, contrary to the Defendant's allegations on appeal, this does not end our inquiry because we must also determine if the out-of-court statement was offered for the truth of the matter asserted therein. On redirect examination, the State asked the victim for further details about the fall into the fence hole in an attempt to disparage the Defendant's insinuation of an alternate source of injury for the victim's leg bruise. The victim then provided particulars about the incident, including his resulting broken elbow. No mention was made of any injury to the leg.

The State then asked if the victim had ever been diagnosed with brittle bone disease. The form of the prosecutor's question—"[h]ave you ever"—makes it unclear if this diagnosis was discussed during treatment for the broken elbow or at some other time. The victim then testified that the diagnosis "was never confirmed" and that all of his broken bones came "from normal situations." Thereafter, the victim testified about "some other breaks" that he had before, including a broken leg.

We agree with the attorney general's representation on appeal that "one might ask what the State's rational[e] might have been for asking [the victim] about his [b]rittle [b]one diagnosis." At the motion for new trial hearing, the prosecutor herself characterized the diagnosis as "really irrelevant to the entire trial." The State sought to discredit any possibility of the victim's having brittle bone disease and show that the victim's prior breaks all occurred "from normal situations." However, a correlation between the broken elbow from the fence hole fall, a brittle bone disease diagnosis, and the victim's leg bruise was never provided. Given the victim's testimony, the irrelevant nature of the diagnosis, and the trial court's ruling without discussion, it is unclear from the record whether the brittle bone disease diagnosis was offered for the truth of the matter asserted. However, because the brittle bone disease diagnosis did not significantly enhance or detract from the evidence against the Defendant that he caused the leg bruise to the victim by hitting him with a branch, admission of the statement, even if incorrect, can be classified as harmless error.

B. <u>Cpl. Deloach's testimony about T.K.'s stated reasons for calling 9-1-1</u>. The Defendant contends that Cpl. Deloach's testimony about T.K.'s statements to him explaining why she called 9-1-1 was inadmissible hearsay not subject to any exception. The State responds that the trial court properly allowed Cpl. Deloach to testify about the call that brought him to the scene.

On direct examination, the State asked Cpl. Deloach to explain his actions upon arriving at the scene. Cpl. Deloach testified that he first spoke with the Defendant and asked "what was going on." The Defendant replied that the victim was mad at him, so she "called the cops . . . on [him] again[.]" He also said "something about a phone[,]" according to Cpl. Deloach. At that point, T.K. emerged from the neighbor's house, and Cpl. Deloach approached her and asked what was going on. As Cpl. Deloach began to

relay what T.K. said to him, defense counsel objected on hearsay grounds. No ruling was made, but the prosecutor then rephrased the question. The following colloquy ensued:

> Q. Don't say what she said, okay, just tell us what happened. You came and had a discussion with [T.K.]?
>
> A. Yes. It was about a phone that [the Defendant] had taken. She was wanting it the phone back, stating it was hers.
>
> Q. Okay.
>
> A. Then I went and talked with [the Defendant] about the phone. In which he stated, it was my phone, I bought it for her and I paid for the plan. Which at that point I couldn't make him give the phone back. Which I had already told [T.K.], I could go and ask him about the phone, but if he says no, there's nothing else I can do at that point.
>
> Q. And after you told them there's nothing you can do about the phone, what happened after that?
>
> A. Shortly after, I was about to clear the call, and I was made aware—[T.K.] came up to me and said that she needed to speak with me about—
>
> [DEFENSE COUNSEL]: Your Honor, I object.
>
> THE COURT: That's overruled—as far as it's gone, it's overruled.
>
> [CPL. DELOACH]: Told me that the kids needed to show me something, that they had an injury from an altercation they had the day before.
>
> Q. Okay, and did you assist her with that?
>
> A. Yes, I went and talked to the kids.

Cpl. Deloach then recounted his conversation with the children about the whipping and their injuries. Defense counsel continued to object on hearsay grounds to statements made by the children to Cpl. Deloach, and at one point, the trial court sustained the objection. The prosecutor also frequently reminded Cpl. Deloach not to testify about statements made by the children. On cross-examination, defense counsel asked many questions about the initial conversation concerning the cellular telephone and insinuated

that T.K. only brought up the children being spanked because Cpl. Deloach told her there was "nothing [he could] do about her cell phone[.]"

Initially, we note that, once the prosecutor rephrased the question and asked Cpl. Deloach to "tell . . . what [had] happened" without "saying what [T.K.] said," defense counsel lodged no further objection regarding Cpl. Deloach's account of his interaction with the couple about the cellular telephone. Thus, it could be concluded that defense counsel found the prosecutor's rephrasing acceptable. The next objection came when Cpl. Deloach said that T.K. asked to speak with him before he left the residence, and he began to relay what she had said to him. The trial court's subsequent ruling, "as far as it has gone, it's overruled," is unclear and seemingly pertains to the specific statement being solicited, and not the prior exchange about the phone.

Regardless if an adequate objection was raised, we agree with the State that the objectionable statements concerning why T.K. called 9-1-1 and the cellular telephone were not being offered for the truth of the matters therein but to explain Cpl. Deloach's actions in assessing the domestic disturbance call which precipitated his arrival at the residence. Moreover, Cpl. Deloach said that, after speaking with the couple, he could not order the Defendant to return the phone to T.K.; thus, any allegation by T.K. about the phone was deemed non-criminal in nature, and he intended to depart the scene. We conclude that Cpl. Deloach's testimony about the statements made by T.K. in this regard was offered to provide an explanation for Cpl. Deloach's presence on the scene and give context for his observations and interactions while there. See, e.g., State v. Marvin Wendell Kelley, No. M2011-02260-CCA-R3-CD, 2013 WL 5827646, at *10 (Tenn. Crim. App. Oct. 29, 2013) (concluding that statements were not hearsay because they were "offered to provide context for [the victim's father's] actions: going to the hospital and, ultimately, removing the victim from life support"); State v. Kendell Edward Johnson, No. M2011-00792-CCA-R3-CD, 2012 WL 3731699, at *18 (Tenn. Crim. App. Aug. 29, 2012) (determining that witness's statements on a tape recording were not offered for the truth of the matter asserted but solely for the purpose of providing the context for the defendant's statements).

The State was not asking the jury to believe what T.K. said to Cpl. Deloach about the phone but instead sought to provide context for why Cpl. Deloach interviewed the children about their alleged injuries and ultimately arrested the Defendant for domestic assault that day. Cpl. Deloach did not testify as to any statement of fact asserted by T.K. regarding the alleged abuse to the children. The challenged statements were not hearsay, and moreover, any error in this regard would be harmless as the Defendant thoroughly cross-examined Cpl. Deloach about T.K.'s motive for calling the police and informing him of the children's injuries.

C. <u>C.K.'s testimony about the victim's statements to their mother</u>. The victim's brother, C.K., relayed the details of the whipping he and his brother received at the hands of the Defendant. On direct examination, C.K. was asked the following:

> Q. After you and your brother were whipped that day, what happened?
>
> A. My—we were in bed and [the Defendant] took my mom's phone, that's why she called the police. And G.K. also told her about what happened—

Defense counsel lodged a hearsay objection, which the trial court overruled, stating, "It wasn't a hearsay statement in there." Questioning continued,

> Q. You went to bed that night?
>
> A. And woke up like early in the morningish [sic] and G.K. told her what happened.

Defense counsel again objected, and that objection was again overruled for the same reason. Thereafter, C.K. testified that his mother called 9-1-1 the day after the Defendant spanked them and that the victim did not tell their mother "about what happened" until after she called the authorities about the cellular telephone. C.K. said that he did not tell his mother because the victim had already told her.

The Defendant asserts that "C.K. repeating what G.K. told their mother was surely offered for the purpose of showing that G.K. repeated the story to their mother, for the truth of the matter asserted essentially." The State responds that testimony was not hearsay because C.K. "did not recite any fact regarding the offense of which the [D]efendant was charged."

No hearsay specifics were elicited from C.K. regarding G.K.'s statements to their mother "about what happened." C.K.'s testimony established their mother's basis of knowledge of the victim's injuries and when she was informed of the whipping. C.K.'s testimony counteracted the Defendant's insinuation that T.K. did not tell the police of the whipping on the telephone and only told Cpl. Deloach as retribution once he told her that he could not do anything about returning the cellular telephone to her. Additionally, C.K. was also present during the spanking of the victim and was himself spanked by the Defendant. His first-hand recounting of the spanking significantly bolstered the victim's credibility, and the challenged statements did little in that regard contrary to the Defendant's assertion. Again, we agree with the State and conclude that the statements were not hearsay, but even so, any error in admission was harmless.

*II. Lesser-Included Offense Instruction*

The Defendant argues that the trial court erred by refusing to instruct on the lesser-included offense of domestic assault by extremely offensive or provocative physical contact. The State replies that the evidence did not justify a jury instruction on the lesser-included offense.

A defendant has a constitutional right to a full and complete charge of all lesser-included offenses charged in the indictment. State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001). When an issue is raised regarding the trial court's failure to instruct on a lesser included offense, our analysis typically involves a determination of: (1) whether the offense is a lesser-included offense; (2) whether the evidence supports an instruction on the lesser-included offense; and (3) whether the failure to instruct on the lesser-included offense constitutes harmless error. State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002).

"A person commits domestic assault who commits an assault as defined in § 39-13-101 against a domestic abuse victim." Tenn. Code Ann. § 39-13-111. Tennessee Code Annotated section 39-13-101, as referenced in the domestic assault statute, defines assault as follows:

(a) A person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101(a). When bodily injury results or is reasonably feared, the offense is a Class A misdemeanor. Tenn. Code Ann. § 39-13-101(b)(1). If only physical contact which is extremely offensive or provocative occurs, the offense is a Class B misdemeanor. Id.

Here, the Defendant was indicted for domestic assault by causing bodily injury: "[The Defendant], . . . on August 07, 2012, . . . unlawfully, and intentionally, knowingly or recklessly did cause bodily injury to a minor child with a date of birth of [January] 1999 and with whom [the Defendant] has lived with . . . ." The trial court charged the jury only with domestic assault by causing bodily injury and declined the Defendant's

-12-

request to charge, as a lesser-included offense, domestic assault by extremely offensive or provocative contact. Our supreme court has determined that assault by an extremely offensive or provocative contact is a lesser-included offense of assault by causing bodily injury. See State v. Smiley, 38 S.W.3d 521, 525 (Tenn. 2001). However, this does not end our inquiry, as the proof must also support such a charge. Id.

The trial court determined that the lesser-included offense was not "embraced by the evidence in this case." We agree. Under the facts of this case, the Defendant's actions were not of the type that our supreme court has characterized as "offensive or provocative"—that is, actions which offend one's sense of personal dignity but do not cause injury, such as "kissing without one's consent, cutting one's hair without consent, or spitting in one's face." Smiley, 38 S.W.3d at 525 (citing Stuart M. Speiser, et al., The American Law of Torts, § 26:15). Accordingly, we conclude that no reasonable jury could conclude that the Defendant committed an assault by extremely offensive or provocative physical contact. See, e.g., State v. Michael Cammon, No. M2001-00592-CCA-R3-CD, 2002 WL 31414089, at *3-4 (Tenn. Crim. App. Oct. 25, 2002) (concluding that a lesser-included instruction on assault by extremely offensive or provocative touching was not warranted were there was proof that the deputy sustained bodily injuries—minor cuts and abrasions, a chipped tooth, and bite marks on his hands—during the struggle with the defendant). The Defendant, using a tree branch, struck the victim's backside, leaving visible bruising. Cpl. Deloach described it as "a real deep purple bruise" that was approximately the "softball size in area." The victim testified that his bottom hurt every time he sat down and that it would "ache" when he "would pick up to run a little bit[.]" The bruise was exhibited for the jury in a photograph. This injury clearly rises to the level of "bodily injury." See Tenn. Code Ann. § 39-11-106(a)(2) ("'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty."); see also Smiley, 38 S.W.3d at 525. Because the evidence in this case is insufficient to support a conviction of assault by "extremely offensive or provocative" physical contact, the jury should not have been instructed on the lesser-included offense, and the trial court did not err.

### III. Cumulative Error

Lastly, the Defendant argues that the cumulative effect of the alleged errors entitle him to a new trial. However, "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010). Therefore, we conclude that the Defendant is not entitled to a new trial on this basis.

## CONCLUSION

Based on our review of the record, the briefs of the parties, and the applicable legal authority, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE